UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SILVEIRA INDUSTRIES, LTD.,

                        Plaintiff,

    -v-                                      7:06-CV-265

ACTUS LEND LEASE, LLC,

                        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                              OF COUNSEL:

SHEATS & ASSOCIATES PC              EDWARD J. SHEATS, ESQ.
Attorneys for Plaintiff                      PATIENCE E. SCHERMER, ESQ.
9646 Brewerton Road
P.O. Box 820
Brewerton, NY 13029

HANCOCK & ESTABROOK, LLP         JOHN G. POWERS, ESQ.
Attorneys for Defendant                 THOMAS C. CAMBIER, ESQ.
1500 AXA Tower I
Syracuse, NY 13221

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

      Plaintiff Silveira Industries, Ltd. ("Silveira" or "plaintiff") filed this breach of contract action in New York State Supreme Court, Jefferson County, on January 18, 2006. In its complaint, plaintiff asserted four causes of action: first, for breach of contract to recover for work performed; second, for unjust enrichment to recover for services, materials, and

equipment performed and provided; <u>third</u>, for interference with performance of work due to disruption to recover for performance of additional services and provision of additional equipment and materials; and <u>fourth</u>, for breach of contract to recover for unperformed work due to defendant's alleged wrongful termination of the contract.  Defendant Actus Lend Lease, LLC ("Actus" or "defendant") removed the action to the Northern District of New York on February 27, 2006.  Defendant interposed an answer and counterclaims sounding in breach of contract, contractual indemnification, and for attorneys fees.

Defendant moved for partial summary judgment seeking:  (1) a declaration that it validly terminated the contract; and (2) dismissal of plaintiff's Fourth Cause of Action.  Plaintiff opposed.  Defendant replied and moved to strike portions of the Affidavit of Michael W. Porter ("Porter") that was submitted in opposition to defendant's motion.  Plaintiff opposed the motion to strike.

Oral argument was heard on March 17, 2008, in Utica, New York.  Decision was reserved.

## II. BACKGROUND

### A. Facts

Actus was the prime contractor for a design-build contract for on-post housing units and related facilities on Fort Drum, a United States Army installation near Watertown, New York.  Actus entered into a subcontract with Silveira to install concrete foundations for 64 buildings.  The foundations were to be built using a frost protected shallow foundation designed by Actus.  Although work was originally to be started in June 2005, Actus did not send a subcontract to Silveira until September 2, 2005.  Actus held a preconstruction meeting on September 20, 2005, and executed the subcontract on September 29, 2005.

The subcontract provided for a completion date of May 31, 2006.  It also provided that a winter break during which work was halted would occur.  Thus, according to the construction schedule Silveira needed to complete an average of 2.5 foundations per week in order to meet its performance obligations under the subcontract.  According to the subcontract, Silveira needed a labor crew of approximately 30 workers in order to meet the construction schedule.  The total amount of the subcontract was $2,523,736.

After Actus executed the subcontract on September 29, 2005, Silveira mobilized at the work site for orientation and safety meetings on October 3, 2005.  On October 4, 2005, it began excavation.  It anticipated beginning excavation at a certain foundation site, then progressing in a logical fashion following the street line to the remaining 63 sites.

Silveira immediately encountered difficulty with the sandy soil because it could not be properly excavated and because soil compaction under the footers, as called for by Actus's frost protected shallow foundation design, could not be accomplished.  In addition to the design/soil compaction problem, rainy weather also created problems.  The rain caused the sandy soil to turn into a kind of soup, creating water migration and soft spots, making excavation nearly impossible.  According to Silveira, pursuant to subcontract provisions it immediately notified Actus of the difficulties, and Actus commenced working on a redesign of the system given the sandy soil conditions.  Actus contends that the redesign related to stone fill rather than the sandy soil conditions; however, it did halt construction.  It further contends that although Silveira could not work on the scheduled first two foundation sites, it was able to continue with excavation on other sites.  Thus, according to Silveira, Actus required it to jump from site to site, resulting in Silveira hopscotching around the foundation sites rather than proceeding in the sequenced fashion it originally anticipated.

Actus approved a redesign allowing Silveira to restart construction on October 11, 2005. The redesign required over-excavation and backfill with rock and fabric to provide the necessary compaction.

Although the subcontract anticipated that Silveira would utilize an average of thirty laborers each day, its work crew was actually about half that. Cold damp windy weather discouraged labor crews from the south from working in the harsh upstate New York weather. Further, Hurricane Rita caused severe damage along the Gulf of Mexico coast, especially in Texas and Louisiana, in late September 2005. Clean up and reconstruction in the aftermath of Hurricane Rita drew labor, materials, and equipment to the south, contributing to Silveira's difficulties obtaining sufficient labor crews.

Rain continued and Silveira's laborers refused to work in the rain. On Friday, October 14, 2005, Silveira's on-site construction manager H. Jack Wills ("Wills") fired the labor crew for refusing to work in the rain. Actus gave Downing Construction's ("Downing") name to Silveira as a potential source of labor. Wills then hired Downing to provide labor. According to their agreement, a certain price per unit completed would be paid, with Silveira paying Downing a draw every two weeks based upon units completed. The Downing labor crew started work on October 20, 2005. Downing was to have provided about 30 laborers; however, only about twelve to fourteen workers were on the job each day. On November 4, 2005, Silveira paid Downing $27,760. At least a few times the Downing laborers left the job site because they had not been paid. Silveira contends that although it had paid Downing, Downing failed to pay its laborers.

Beginning as early as November 8, 2005, the architect's reports noted that rebar had been placed incorrectly, blocks were loose and rocking, blocks were not level, and

footers were improperly placed. Silveira corrected these deficiencies. However, it continued to have problems with insufficient labor despite the efforts of Downing, Wills, Porter (Silveira's principal located in Texas) and Actus. Also, Wills conceded that the labor force it did have was less than adequate and could have used additional supervision, especially given the lack of clarity in the construction plans.

On November 14, 2005, Actus sent to Silveira a First Notice--Notice to Cure ("Notice to Cure"), pursuant to Section 7.1.1 of the subcontract. The Notice to Cure cited inadequate manpower, failure to meet the construction schedule, inadequate supervision for field staff, and poor quality work completed and not per construction plans. The Notice to Cure gave Silveira 24 hours from receipt to notify Actus how it intended to correct the delineated deficiencies. It further notified Silveira that Actus had already employed workers or subcontractors to maintain the production schedule, the cost of which would be borne by Silveira.

On November 21, 2005, Actus sent a Notice of Default pursuant to Section 7.1.2 of the subcontract. According to the Notice of Default, Silveira failed to respond to the Notice to Cure within 24 hours, and again provided that Silveira should respond with its planned action to cure the default. Should it fail to do so, Actus then had the right to terminate the contract and use all of Silveira's materials and equipment in order to complete the work. Additionally, Actus declared that Silveira was in default and Actus intended to withhold payment, pursuant to Sections 7.1 and 7.1.1(A)-(B) of the subcontract. According to Silveira, it received both the Notice to Cure and the Notice of Default on the same day, November 21, 2005. Silveira responded by letter that day, November 21, 2005.

On November 23, 2005, Actus responded to Silveira's letter dated November 21, 2005. This letter again cited the lack of manpower and failure to complete any foundations. The letter states: "As of the 5th of December 2005, Silveira Industries Ltd, has abandoned the Project." (Powers Decl. Ex. P.) Actus characterizes this as a termination letter, effective December 5, 2005.

Also on November 23, 2005, Downing requested an additional payment of $44,000. Meanwhile, however, Silveira had not received a single payment from Actus. Actus contends that Silveira was not due a payment under the subcontract. Because it had not been paid, Silveira did not pay Downing. Because Downing was not paid, it filed a mechanics lien against the construction project. Eventually Actus paid Downing's workers and obtained a discharge of the lien.

Silveira failed to pay, at least to some extent, the following vendors, equipment suppliers, and materialmen: McQuade & Bannigan (equipment supplier), Jefferson Concrete (materials and equipment), JLM Concrete Pumping (services, material, and equipment), Hertz Equipment Rentals (equipment), Seaway Rental Corp. (services, material, and equipment), Equipment Rental Co. (equipment), Taylor Concrete Products (material and equipment), and Champion Materials (materials and equipment).

### B. Subcontract Terms

To the extent applicable to the analysis to follow, the subcontract between Actus as contractor and Silveira as subcontractor makes the following provisions. Section 7.1 of the subcontract provides for recourse by the contractor in case of a failure to perform by the subcontractor. (Powers Decl. Ex. A at 34.) If a subcontractor does not supply sufficient or adequate workers and proper materials, or fails to maintain the schedule, or fails to pay lower

tier subcontractors or suppliers, or otherwise is in material breach of any terms of the subcontract, the contractor may deem the subcontractor to be in default. Id. § 7.1.1. Upon written notification of such breach, within two working days of receipt of the notification, the subcontractor may provide in writing its intent to cure the default and must promptly take action to effect a cure. Id. Should the subcontractor fail to correct the default, the contractor may remedy the default by any means, including supplying workers and materials to perform the work, and deducting the cost of the means used from any amount due to the subcontractor. Id. § 7.1.1(a). The Contractor also may withhold or deduct from a payment application by the subcontractor a sufficient amount to cover losses and compel remedial performance. Id. § 7.1.1(b). These remedies may be undertaken by the contractor without notice to the subcontractor only in "an emergency affecting the safety of persons or property." Id. § 7.1.1(c).

As an alternative to the remedies in section 7.1.1, a contractor may, on 24-hour notice to the subcontractor and allowing 24 hours for the subcontractor to cure the default, terminate the subcontract. Id. § 7.1.2. All costs the contractor incurs in remedying the default, including attorney's fees, are borne by the subcontractor. Id.

The subcontract also provides that the contractor may terminate the subcontract upon notice and effective immediately if the subcontractor, among other things, does not supply sufficient and adequate workers; fails to maintain the construction schedule; fails to promptly pay its workers and/or suppliers; or materially breaches any provision of the subcontract. Id. § 7.1.4.

In the event of a determination that the contractor wrongfully terminated the subcontract, the subcontract provides that only overhead and profit on work adequately performed as of the date of the termination are recoverable by the subcontractor. Id. § 7.6.

### III.  SUMMARY JUDGMENT STANDARD

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986).  The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986).  Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986).

When the moving party has met the burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., 475 U.S. at 586, 106 S. Ct. at 1356.  At that point, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56; Liberty Lobby, Inc., 477 U.S. at 250, 106 S. Ct. at 2511; Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356.  To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. Liberty Lobby, Inc., 477 U.S. at 248-49, 106 S. Ct. at 2510; Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356.

## IV. **DISCUSSION**

In its motion for partial summary judgment Actus seeks relief in two ways. First, it seeks a declaration that Actus validly terminated the subcontract based upon Silveira's material breach. Second, Actus seeks dismissal of Silveira's fourth cause of action for lost profits on unperformed work based upon a contractual provision limiting recovery to lost profits for performed work.

As noted, Actus moved to strike the Porter Declaration that Silveira submitted in opposition to the motion for partial summary judgment. The basis for the motion to strike is twofold. First, Actus argues that certain paragraphs of the declaration are improper in that they contradict previous deposition testimony. Porter testified in deposition essentially that he did not know any details personally about the bidding process, the soil conditions at the site, and any incidents or problems at the site. However, his declaration recites detailed facts (attributed to the sources of the information) about these things. Second, Actus argues that the declaration contains recitations of facts of which Porter had no personal knowledge, such as the bidding; subcontract and terms; assignment of a foreman on the site; condition and competency of the laborer crew; the nature, scope and sufficiency of the work performed; use of a second laborer crew; upstate New York weather conditions; and status and viability of Actus's work plans and/or designs. To the extent that the Porter Declaration sets forth facts contradictory to his prior deposition testimony and facts without which Porter has personal knowledge it will not be considered on the motion for partial summary judgment.

Actus's first ground for partial summary judgment is that it validly terminated the subcontract due to material breaches because Silveira failed to provide adequate staffing;

inadequately supervised its staff; failed to maintain the construction schedule; performed defective work; and failed to pay its vendors, subcontractors, and materialmen.

The subcontract anticipated that a crew of 30 laborers would be required to keep the construction schedule. There is no dispute that Silveira never had a crew of more than 20 workers on site. Rather, its crew averaged around twelve to fourteen laborers. Further, there is no dispute that after nine weeks on site, Silveira begun work on nine foundations but had not completed a single foundation. According to the construction schedule of 2.5 foundations per week, Silveira should have completed 22 foundations in those nine weeks. While there is some documentation that some of Silveira's work was substandard or defective, it also appears that Silveira corrected the problems at least to a minimum acceptable level. Finally, Silveira admits that it failed to pay all of amounts due to Downing, McQuade & Bannigan, Jefferson Concrete, JLM Concrete Pumping, Hertz Equipment Rentals, Seaway Rental Corp., Equipment Rental Co., Taylor Concrete Products, and Champion Materials. Each of these items, with the possible exception of substandard or defective work, constitute a material breach of the subcontract pursuant to section 7.1.1.

Actus provided notification to Silveira that it was in default of the subcontract via a Notice to Cure dated November 14, 2005. Silveira did not respond or cure the default. On November 21, 2005, Actus provided a Notice of Default to Silveira stating that it was in material breach of the subcontract and Actus would take measures to perform the appropriate work. Actus took these actions pursuant to section 7.1.1. On November 23, 2005, Actus relied upon an alternative remedy as provided by section 7.1.2 and terminated the subcontract with Silveira.

Silveira does not dispute these facts. Rather, it relies upon reasons why it was in default of its obligations under the subcontract and could not cure--for example, it was behind on the construction schedule due to sandy soil condition, redesign of the foundation system, and hopscotching, all allegedly caused by Actus. However, it points to no provision of the subcontract, and cites no other authority, for the proposition that these reasons make the termination under the subcontract improper. Accordingly, under the express terms of the subcontract, Actus validly terminated the subcontract with Silveira, and a grant of summary judgment making that declaration is appropriate.

However, that is not to say that all liability issues are settled, as Actus indicates it believes to be the case. (Deft. Reply Mem. at 1 n.2.) Rather, it remains for the trier of fact to determine whether Silveira will prevail on its claims for damages based upon different or changed conditions, disruption, acceleration, and delay. In fact, Actus did not move for summary judgment dismissing those claims.

The second relief Actus seeks is summary judgment dismissing Silveira's cause of action for profits lost by the early termination of the subcontract. As has been determined, Actus properly terminated the subcontract due to Silveira's material breach. Moreover, the subcontract expressly provides that even in the case of a wrongful termination by Actus, damages are limited to "reasonable overhead and profit on only [Silveira's] Work adequately performed through the date of [Silveira's] termination." (Powers Decl. Ex. A at 37 § 7.6.)

Silveira argues that the clause exculpating Actus from lost profits damages for unperformed work should be held unenforceable because Actus caused the delays that resulted in it not completing all of the work covered by the subcontract. Silveira's reliance on Corinno Civetta Constr. Corp. v. City of New York, 67 N.Y.2d 297 (N.Y. 1986), for this

proposition is misplaced. In Corinno Civetta Construction, the court recognized the limited exceptions in which exculpation clauses would not preclude a claim for damages. Id. at 309. In that case, the only potentially analogous scenario involved a contractor that terminated work, at the time set forth for completion of the project, without having actually completed the work.[1] Id. at 307. The court found that the possibility of delays caused by coordination with other contractors was contemplated by the parties and there was no showing of willful, malicious, bad faith, or grossly negligent conduct by the contractee. Thus, the exception was inapplicable and the exculpatory clause barred a claim for delay damages. Id. at 316. Further, the court rejected the plaintiff's argument that the contractee's "conduct was so unreasonable that it connoted an abandonment of the contract" entitling the contractor to damages for breach. Id. at 316-17. Here Silveira's claim for delay damages awaits trial. Additionally, there is no suggestion that Actus abandoned the contract. Recovery for lost profits damages for unperformed work was contemplated by the parties and Actus is entitled to the benefit of its bargain--exculpation from liability for such damages.

Silveira suggests that the public policy reasons underlying the Corinno Civetta Construction decision should be applied here to permit recovery for profits on unperformed work despite the parties' clear contemplation that no such recovery would ensue even from a wrongful termination. However, Silveira fails to expand upon the purported public policy reasons to demonstrate how application in this case would result in "equity and fairness," especially given that public policy and fairness supported damages recovery for work

---

[1] The other plaintiffs in the four cases heard on appeal together all completed the work contemplated by the contract, but did so after the deadlines set forth in the contracts. Id. at 306-08. These plaintiffs are factually distinguishable from this case.

performed, not, as is the case here, for work not performed.  Moreover, application of any policy and fairness doctrine in the manner suggested by Silveira would be contrary to the disfavor with which recovery for lost profits is viewed under New York law.  See, e.g., Travellers Int'l, A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1577-78 (2d Cir. 1994) (citing Kenford Co. v. County of Erie, 76 N.Y.2d 257, 261 (1986), Trademark Research Corp. v. Maxwell Online, Inc., 995 F2d 326, 332-34 (2d Cir. 1993)) (setting forth the "stringent requirements" for recovery of lost profits damages under New York law).  Under New York law, lost profits damages may only be recovered if such recovery was contemplated at the time the contract was executed.  Id. at 1578.  Here, the parties contemplated that recovery for lost profits for unperformed work could not be had--as expressed specifically in the contract.  Accordingly, Actus is entitled to summary judgment dismissing Silveira's claim for lost profits for unperformed work.

## V. **CONCLUSION**

Actus's motion to strike the Porter declaration is granted to the extent that portions of the delaration contradictory to prior deposition testimony and not based upon personal knowledge were not taken into consideration on the motion for partial summary judgment. Actus's motion for partial summary judgment declaraing that it validly terminated the subcontract is granted pursuant to the express language of the subcontract.  However, this finding does not resolve the liability issue as to Silveira's claims for changed conditions, disruption, acceleration, and delay damages--that liability issue remains for trial.  It was contemplated at the time the parties entered into subcontract that damages for lost profits for unperformed work would not be recoverable.  Thus, Actus is entitled to summary judgment dismissing Silveira's cause of action for lost profits damages for unperformed work.

Accordingly, it is

ORDERED that

1. Actus's motion to strike the Porter declaration is GRANTED to the extent that improper facts set forth therein were not considered on the partial summary judgment motion;

2. Actus's motion for partial summary judgment is GRANTED;

3. Actus properly terminated the subcontract;

4. Silveira's Fourth Cause of Action seeking lost profits damages for unperformed work is DISMISSED; and

5. Remaining for trial are Silveira's First, Second, and Third Causes of Action and Actus's Counterclaims.

IT IS SO ORDERED.

_____
United States District Judge

Dated: December 24, 2008
      Utica, New York.